**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1017-23

JASMINE ROBINSON,
individually, and on behalf
of her minor daughter,
VANESSA ROBINSON,

     Plaintiff-Respondent,

v.

CHRISTOPHER STENGEL
and MY TREE BOYZ, LIMITED
LIABILITY COMPANY,

     Defendants-Respondents,

and

RUSSELL KLINE, DISH
NETWORK SERVICE, LLC,
and DISH NETWORK, LLC,
jointly, severally and in the
alternative,

     Defendants-Appellants.

_____

Argued January 29, 2025 – Decided July 23, 2025

Before Judges Rose, DeAlmeida, and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-3919-21.

Richard J. Williams, Jr. argued the cause for appellants (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Richard J. Williams, Jr. and Brianna Martinotti, of counsel and on the briefs).

Dominic R. DePamphilis argued the cause for respondent Jasmine Robinson (D'Arcy Johnson Day, attorneys; Richard J. Albuquerque and Dominic R. DePamphilis, on the brief).

Lori S. Klinger argued the cause for respondents Christopher Stengel and My Tree Boyz, LLC (Kent/McBride, PC, attorneys; Lori S. Klinger, on the brief).

PER CURIAM

Defendants Russel Kline, Dish Network Service, LLC (DNS), and Dish Network, LLC (DN) (collectively, the Kline Defendants) appeal from the October 10, 2023 Law Division judgment memorializing a jury verdict awarding plaintiff Jasmine Robinson $3.5 million in damages for injuries she suffered in a three-car motor vehicle accident. The jury found the Kline Defendants forty percent at fault for the accident and defendants Christopher Stengel and My Tree Boyz, Limited Liability Company (MTB) (collectively, the Stengel Defendants) sixty percent at fault. The jury attributed no fault to plaintiff.

2

The Kline Defendants also appeal the trial court's denial of their motion for judgment notwithstanding the verdict (JNOV), a new trial, or remittitur, arguing: (1) the verdict is inconsistent, contradictory, and not supported by the evidence; (2) three evidentiary rulings by the trial court subjected them to a miscarriage of justice, i.e., admitting the audio portion of a police dashboard camera recording of the accident scene while plaintiff was trapped inside her vehicle and crying in pain, excluding evidence of Stengel's prior criminal conviction for drug possession, and excluding a diagram of the accident created by an officer who responded to the scene; (3) the jury's allocation of fault was against the weight of the evidence and resulted in a miscarriage of justice; and (4) the amount of damages awarded by the jury was excessive. We affirm.

I.

The evidence admitted at trial establishes the following. At about 1:00 p.m. on December 29, 2019, plaintiff was operating a car traveling south on State Route 54 near its intersection with Jackson Road in Buena Vista Township. Traffic at the intersection was controlled by a traffic light. At the same time, Kline was operating a van owned by his employer, DNS and/or DN, traveling north on State Route 54 approaching the same intersection. Also at that time,

3

Stengel was operating a small truck owned by his employer, MTB, traveling west on Jackson Road.

The light turned from green to yellow for both plaintiff and Kline as they approached the intersection. Kline was about two hundred feet from the intersection when he observed the yellow traffic signal. He admitted he was driving above the fifty-five-mile-per-hour speed limit and made no effort to stop or slow down before entering the intersection. Kline testified he "wanted to try to get through that light before it turned red" and did not assess whether he could stop safely.

Stengel testified he was stopped at the intersection at a red light and proceeded into the intersection when the light turned green. This testimony was inconsistent with the other evidence presented at trial and was clearly rejected by the jury. As Kline entered the intersection through the yellow light heading north, Stengel also entered the intersection from Jackson Road heading west. Kline testified he saw Stengel enter the intersection and moved to the left in an attempt to avoid a collision.

Kline's van and Stengel's truck collided in the intersection. The impact caused Kline's van to careen across the intersection and into the southbound lane of traffic on Route 54. There, plaintiff was approaching the intersection with a

4

yellow traffic signal at about fifty-five miles per hour. Plaintiff believed she was too close to the intersection to stop safely and intended to proceed through the yellow light. Before plaintiff's car entered the intersection, it was struck by Kline's van, causing heavy front-end damage and entrapping plaintiff in the wreckage. Plaintiff sustained significant injuries to her lower extremities, including open fractures in both legs and one knee, as well as a closed arm fracture, a closed knee fracture, and other injuries.

State Trooper Jonathan Morenski responded to the scene of the accident. A dashboard camera in his patrol car recorded his arrival and the heavily damaged vehicles. The audio portion of the approximately four-minute recording depicts plaintiff in a highly emotional state crying, screaming, whimpering, breathing heavily, and pleading to be extricated from the vehicle. She can be heard saying, among other things: "my legs hurt really bad;" "I just need to get them off of here really bad. They really hurt. They really hurt;" "[i]t hurts really bad. Oh, my God;" "[o]h, my God. My legs, they hurt so bad;" and "there's nothing wrong up top, I just – I can't breathe." The video ends shortly after the first emergency medical technician (EMT) arrives on scene.

On December 8, 2021, plaintiff filed a complaint in the Law Division seeking damages for injuries she suffered in the accident. She alleged the

5

accident was caused by the negligent conduct of Kline and Stengel. In addition, she alleged DNS and DN were responsible for Kline's negligent conduct, as well as their negligent hiring and retention of Kline and MTB was responsible for Stengel's negligent conduct, as well as its negligent hiring and retention of Stengel.[1]

Plaintiff moved in limine to admit the dashboard camera recording at trial. Defendants consented to the admission of the video portion of the recording but opposed admission of the audio recording. They argued the audio recording had no probative value and, if it had probative value, then under N.J.R.E. 403, that probative value was outweighed by the audio recording's potential for undue prejudice. Defendants argued the audio recording was likely to evoke sympathy and passion in the jurors that could lead to the award of damages for inappropriate reasons. In addition, defendants argued the evidence would be cumulative because plaintiff and Morenski were expected to testify about plaintiff's pain and suffering in the immediate aftermath of the collision.

In an oral decision issued on September 26, 2023, the court found the audio recording "highly probative . . . of exactly what was going on in . . .

---

[1] Plaintiff also filed the complaint on behalf of her infant daughter who was a passenger in plaintiff's car at the time of the accident. The claims on behalf of the infant were resolved before trial.

[p]laintiff's mind and body in terms of pain immediately upon police arrival at the scene of the crash." The court found the recording was the best evidence of plaintiff's pain and suffering at the time of the crash because her testimony on that topic would be given at least four years after the accident.

With respect to potential prejudice, the court found plaintiff's statements in the recording were "a little bit more controlled than [it] would have expected for that type of injury and that type of accident. [I]t was not shocking in my mind at all, and it was pretty controlled." The court found any potential prejudice from plaintiff's statements in the recording would not outweigh its probative value.

Finally, the court found the audio recording was not cumulative of expected testimony. Instead, the court found the recording would likely be corroborative of testimony by plaintiff or Morenski. A September 26, 2023 order memorialized the trial court's decision.

The Stengel Defendants moved in limine to preclude evidence of Stengel's prior criminal convictions. At his 2022 deposition, Stengel testified he was a recovering drug addict who was "ten years clean" and was convicted of drug-related criminal offenses in New Jersey. He testified he could not recall the number of times or when he was convicted. The Kline Defendants opposed the

7

motion. They argued that if they uncovered records of Stengel's prior convictions, the documents would be admissible for impeachment purposes if Stengel testified.

On September 26, 2023, the court issued an oral decision granting the motion. The court found the only evidence in the motion record of Stengel's criminal history was his deposition testimony. Noting it had no evidence of whether Stengel's convictions involved dishonesty, lack of veracity, or fraud, the court found it was unable to determine if the convictions, which Stengel represented were more than ten years old, had probative value as to his credibility as a witness. In addition, the court concluded that even assuming the convictions were probative of Stengel's credibility, their probative value would be outweighed by their potential for prejudice. A September 26, 2023 order memorialized the trial court's decision.

Later that day, the Kline Defendants moved for reconsideration of the order granting Stengel's motion to exclude his past criminal convictions. In support of the motion, they attached a certified record of Stengel's September 2018 conviction for third-degree possession of a controlled dangerous substance (CDS) with intent to distribute, N.J.S.A. 2C:35-5(b)(13). For that conviction, which was less than two years before the accident, Stengel was placed on a four-

year probationary term and permitted to leave home only for work. He was on probation at the time of the accident.

On October 3, 2023, the court issued an oral decision denying the motion for reconsideration. The court found pursuant to N.J.R.E. 609(a), evidence of the conviction was admissible, subject to N.J.R.E. 403. The court concluded the probative value of the conviction for purposes of challenging Stengel's credibility was outweighed by its potential prejudicial effect. The court found the crime of which defendant was convicted did not involve moral turpitude, which weighed against its probative value with respect to his credibility. In addition, the court found a conviction for possession of a CDS with intent to distribute would be highly prejudicial to the jury. On balance, the court concluded, the evidence was not admissible under N.J.R.E. 403.

In addition, the Kline Defendants argued Stengel's deposition testimony should be admissible on cross-examination because he lied about his criminal history. The court examined Stengel's deposition testimony and determined the record did not establish he lied under oath when he testified he was "clean" for ten years and could not recall the dates and nature of his prior criminal convictions. An October 3, 2023 order memorialized the trial court's decision.

A-1017-23

The matter was tried before a jury over three days. Morenski, who was familiar with the intersection, testified that generally when the light controlling traffic on Route 54 is yellow, the signal controlling traffic on Jackson Road is red. In addition, he detailed his investigation of the accident, including his preparation of a diagram based on his observations of the damage to the three vehicles. The diagram showed all three vehicles in multiple positions with arrows indicating their direction of travel, as well as their points of impact. According to Morenski, the diagram contained a fair and accurate depiction of the vehicles' points of impact. He did not testify as to the accuracy of the locations at which the vehicles were depicted on the diagram as they traveled toward the intersection.

Kline moved to admit the diagram as evidence. Stengel objected, arguing the diagram was not drawn to scale and Morenski conceded he took no measurements at the scene, did not calculate speed over distance ratios for the vehicles, did not download data from the vehicles' recording systems, and obtained no information with respect to the timing of the traffic light at the intersection. Thus, Stengel argued the diagram was misleading as to the location and movement of the vehicles prior to the points of impact and its probative value was outweighed by its potential to prejudice Stengel because the diagram

10

could be interpreted to represent the officer's opinion Stengel drove through a red light.

The court issued an oral decision sustaining Stengel's objection. The court found the diagram depicted Stengel's truck as a vehicle in motion on Jackson Road when Morenski did not observe the accident. In addition, the court found the diagram depicted the movement of both Kline's van and plaintiff's car on Route 54 from certain points outside the intersection to the intersection. The court found Morenski did not observe those movements and had no data on which he could estimate the locations and movement of the vehicles as they approached the intersection. The court concluded, while Morenski's depictions of the vehicles' points of impact might be admissible, the depictions of the locations and movement of the vehicles outside the intersection lacked a foundation for admission as evidence and would confuse the jury.

Plaintiff testified she was a twenty-two-year-old mother at the time of the crash and was extricated from the vehicle with special equipment. When rescue workers were cutting apart her car to free her, plaintiff was not able to move and felt crushing pain in her legs. She was taken to a trauma center after EMTs attached external fixators that felt like "something was stuck" in her legs and which prevented her from moving. She did not look at her open fractures,

fearing what she might see. Photographs of plaintiff's injuries taken while at the hospital were admitted in evidence. She spent thirteen days in the hospital, during which she underwent three surgeries. Medical staff applied external fixators to her legs, implanted rods, plates, and screws in her legs and knee, and performed surgery on her arm.

Plaintiff thereafter received in-patient treatment at a rehabilitation center for a little over a month. Most of plaintiff's time was spent in one room. Her arm was in a cast. At first, she could do nothing for herself. Her open leg and knee wounds were packed and had to be changed two or three times a week in a painful process. Therapy sessions of forty-five minutes were painful and difficult.

Upon discharge, plaintiff returned to her aunt's house and slept downstairs for a week. For the next eight weeks, plaintiff could not put pressure on her legs, stand, or walk. Plaintiff's legs were in casts and she scooted up the stairs on her buttocks, one step at a time, while her aunt held her legs to prevent them from dragging on the steps. Eventually, the casts were removed and braces installed. Plaintiff's wounds remained open while she was at her aunt's house, requiring bandage changes by a visiting nurse. Over time, plaintiff progressed

12

to a wheelchair and crutches. With the assistance of outpatient therapy, plaintiff regained her ability to walk without assistance of a device.

At the time of trial, she remained in pain, including "a sore feeling throughout [her] legs" whenever she moved. The hardware installed in plaintiff's legs, knee, and arm remained in place. Plaintiff continued to feel the screws and plates in her knees, which she described as "hard," and having limited mobility. Plaintiff could also feel the hardware in her legs, which ached when it was cold. Plaintiff's legs are scarred from the bottom of both legs up to her hips. Photographs of the scars were admitted in evidence and plaintiff showed some of her scars to the jury.

As of the time of trial, plaintiff took medication for nerve damage and restless leg syndrome. Some places in her legs were numb. Plaintiff also took antidepressants and testified her scars affected her mentally. She stopped wearing shorts, as she did not like to show her legs. She walked with a slight limp and could not single-leg stand or hop. These conditions were not excepted to change.

At the time of the accident, plaintiff worked at a convenience store. She testified her career goal had been to become a police officer. Plaintiff believed her injuries would prevent her from obtaining that position.

 A-1017-23

Plaintiff presented Dr. Steven Zabinsky, an orthopedic surgeon, as an expert witness. Zabinsky, who performed a medical examination of plaintiff, described the fractures and other injuries she suffered in the accident and the surgical procedures she underwent to treat those injuries. He recounted, among other things, plaintiff's shattered kneecap, open tibia fracture, open femur fracture, torn tendon, and torn skin. Zabinsky explained the inflammation, tendonitis, chronic pain, and physical limitations resulting from the injuries. He also detailed the metal hardware screwed into plaintiff's bones, and the significant loss of skin, tissue, and muscle due to the trauma she suffered. Three medical illustrations of plaintiff's injuries and surgeries were introduced as evidence during Zabinsky's testimony.

Zabinsky testified plaintiff's complaints of daily pain and limitations are consistent with her injuries. He opined plaintiff's injuries are permanent and significant. Zabinsky testified plaintiff's prognosis was poor, as she will develop severe arthritis and need future treatment, such as bracing, injections, therapy, removal of plates and screws, testing, and therapy. He opined plaintiff suffered life- and limb-threatening injuries in the accident and it was "nothing short of a miracle" she lived, kept her limbs, and could walk with a limp.

A-1017-23

Defendants did not refute plaintiff's evidence regarding her injuries, pain, and suffering. They called no witnesses.

The jury found both Kline and Stengel were negligent and their negligence was a proximate cause of the accident. The jury apportioned liability between the Kline Defendants and the Stengel Defendants by assigning sixty percent of fault to Stengel and forty percent to Kline. The jury attributed no fault to plaintiff. At the charge conference, all counsel agreed "the only liability question on the verdict sheet would be as to the two [d]efendants."

The jury awarded plaintiff $3.5 million in damages. The award did not include lost wages or economic damages.

The Kline Defendants subsequently moved for JNOV or, in the alternative, for a new trial or, in the alternative, for remittitur. They argued JNOV was warranted because the jury believed Stengel ran a red light and there was no evidence Kline acted negligently when he proceeded through a yellow light. They also argued plaintiff failed to produce expert testimony to prove Kline could have safely stopped when he saw the yellow light.

The Kline Defendants argued a new trial was warranted because it was a miscarriage of justice for the jury to allocate sixty percent of fault to Kline when the jury also apparently found Stengel ran a red light. In addition, they argued

the trial court's decisions admitting the audio portion of the video recording, and precluding Stengel's 2018 criminal conviction and Morenski's diagram subjected them to a miscarriage of justice, warranted a new trial.

Finally, the Kline Defendants argued remittitur from $3.5 million to $2 million was warranted because the damages awarded by the jury should shock the judicial conscience. They argued the damages were excessive because plaintiff was compensated only for pain and suffering and not economic damages. Plaintiff and the Stengel Defendants opposed the motion.

On November 3, 2023, the trial court issued a written decision denying the Kline Defendants' motion. The court found the record contained sufficient evidence supporting the jury finding that Kline was negligent. The court noted N.J.S.A. 39:4-105, which was part of the jury charge, provides, with respect to traffic signals, "[a]mber, or yellow, when shown alone following green means traffic to stop before entering the intersection . . . unless when the amber appears the vehicle . . . is so close to the intersection that with suitable brakes it cannot be stopped in safety." In addition, the charge read to the jury stated,

> [t]he driver proceeding into (through) an intersection
> with a . . . yellow light does not have an unqualified
> right to proceed. He is obligated to exercise reasonable
> care, which includes making reasonable observations
> for traffic traveling on an intersection street. . . .
> Failure on the part of the driver favored with the . . .

16

> yellow light to exercise such care while proceeding through the intersection is evidence to be considered by you in determining whether that driver was negligent in the operation of his motor vehicle.

The court found a reasonable inference could be drawn from the trial testimony that a reasonable driver in Kline's situation would have brought his vehicle to a stop for the yellow light. The court observed Kline admitted he was traveling above the speed limit, did not assess whether he could stop safely after the light turned yellow, and proceeded into the intersection having made no effort to slow or stop his van. Thus, the court concluded there was sufficient evidence in the record on which the jury could find Kline was negligent, his conduct was the proximate cause of plaintiff's injuries, and he was forty percent at fault for the accident.

The court also concluded a new trial was not warranted because it did not abuse its discretion when it excluded the record of Stengel's past criminal conviction and Morenski's diagram. The court noted several photographs of the post-crash vehicles, from which the points of impact could be seen, were admitted as evidence, negating any harm to the Kline Defendants from the decision to exclude Morenski's diagram. The court found no error in its admission of the audio portion of the dashboard video recording.

Finally, the court concluded the damages award was supported by the evidence and did not shock the judicial conscience in light of the significant and lasting nature of plaintiff's injuries. The court noted at the time of trial, plaintiff had a life expectancy of fifty-four years. When that expectancy is added to three years from the accident to trial, the damage award was less than $61,500 per year ($3.5 million ÷ 57 = $61,403). Thus, the court concluded remittitur was not warranted. A November 3, 2023 order memorialized the trial court's decision.

## II.

### A.    Motion for New Trial.

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge – whether there was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)). In evaluating a trial court's decision to grant or deny a new trial, "an appellate court must give 'due deference' to the trial court's 'feel of the case,'" however, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Id. at

18

386-87 (first quoting Risko, 206 N.J. at 522; and then quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

A trial court "shall grant" a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes, 231 N.J. at 386 (quoting Risko, 206 N.J. at 521-22). A new trial may be ordered if the trial court concludes its erroneous rulings during trial resulted in prejudice to a party leading to an unjust verdict. See Crawn v. Campo, 136 N.J. 494, 510-11 (1994).

"On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski ex rel. Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). "The court is to take into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain,

19                                                                                    A-1017-23

and the intangible 'feel of the case' which it has gained by presiding over the trial." Kita v. Borough of Lindenwold, 305 N.J. Super. 43, 49 (App. Div. 1997).

1.    Weight of the Evidence.

The Kline Defendants argue there was a miscarriage of justice because the jury's allocation of fault was illogical, contradictory, and not supported by the evidence.  We disagree.

According to the Kline Defendants, the evidence establishes both Kline and plaintiff approached the intersection at about the same speed when the light turned yellow and were unable to stop safely.  Thus, they argue, both had the right to proceed through the intersection.  On the other hand, the jury must have concluded Stengel entered the intersection through a red light because if his claim to have proceeded through a green light had been accepted no fault would have been attributed to him.  Thus, the Kline Defendants argue, the only reasonable conclusion the jury could have reached based on the evidence is that neither Kline nor plaintiff were negligent and Stengel was 100 percent liable for the accident and plaintiff's injuries.  In addition, they argue it was illogical and contrary to the evidence for the jury to conclude Kline was at fault but plaintiff was not.

20

In making this argument, the Kline Defendants overlook Kline's admission he was travelling in excess of the speed limit when he approached the intersection, made no effort to determine if he could safely stop, and did not attempt to slow down before he entered the intersection. Nor do the Kline Defendants acknowledge when Kline proceeded through the intersection, he had an obligation to exercise reasonable care, which included making reasonable observations for traffic traveling on the intersecting street. A reasonable jury could have determined a motorist who exceeded the speed limit and proceeded through a yellow light without noticing an approaching vehicle on the intersecting street was liable for a collision with that vehicle. This is true even if the jury determined Stengel proceeded through a red light into the intersection.

In addition, a reasonable jury could have concluded Kline accelerated to travel through the intersection or was travelling at a speed higher than he claimed during his testimony. Stengel's truck spun 180 degrees from the force of its impact with Kline's van. A reasonable jury could have determined that Kline, having made no effort to slow his van, was negligent when he entered the intersection at a speed sufficient to move a truck with such force after impact.

On the other hand, it is undisputed plaintiff, while intending to proceed through the yellow light, did not reach the intersection before Kline's van

21

barreled into her vehicle. No evidence was introduced at trial that plaintiff exceeded the speed limit or failed to exercise due caution as she approached the intersection. Thus, putting aside that counsel agreed not to ask the jury whether fault should be allocated to plaintiff, a reasonable jury could have concluded plaintiff's decision to attempt to proceed through the yellow light was not negligent and did not contribute to causing the accident.

2.    Evidentiary Decisions.

Nor are we persuaded the trial court's evidentiary decisions were erroneous and caused the Kline Defendants to suffer a miscarriage of injustice warranting a new trial.

As a general matter, we will not reverse an evidentiary decision of the trial court absent a finding of abuse of discretion. E.g., Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383 (2010). "The trial court is granted broad discretion in determining both the relevance of the evidence to be presented and whether its probative value is substantially outweighed by its prejudicial nature." Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999). We reverse only those evidentiary decisions "so wide off the mark that a manifest denial of justice resulted." Ibid. There must have been "a 'clear error in

22

judgment'" to warrant reversal. State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

### (a) Admission of Dashboard Camera Audio Recording.

N.J.R.E. 403 allows for the exclusion of otherwise relevant evidence where its "probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." Undue prejudice exists when "the probative value of the evidence 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues.'" State v. Cole, 229 N.J. 430, 448 (2017) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). "It is not enough for the opposing party to show that the evidence could be prejudicial; '[d]amaging evidence usually is very prejudicial but the question here is whether the risk of undue prejudice was too high.'" Ibid.

We have reviewed the record and the recording and find no basis on which to conclude the trial court abused its discretion when it admitted the recording as evidence. The record supports the trial court's conclusion the recording was of significant probative value, given its depiction of plaintiff's mental state

A-1017-23

moments after the crash, while she was entrapped in her car, and experiencing the pain and suffering for which she sought compensation. As the trial court found, the recording was the best available evidence of plaintiff's experience, as the testimony of plaintiff and Morenski on the subject was given four years after the crash.

In addition, the record supports the trial court's conclusion that the while the recording depicts plaintiff's voice in a highly emotional state, complaining of pain, and pleading for help, her statements to Morenski were relatively controlled. It was within the court's discretion to find the recording was not so shocking as to threaten the jury's deliberative process by inflaming their passions and sympathy and diverting them from making a fair determination of whether the Kline Defendants were liable for plaintiff's injuries.

### (b) Exclusion of Stengel's 2018 Conviction.

N.J.R.E. 609 provides that "[f]or the purpose of attacking the credibility of any witness, the witness's conviction of a crime, subject to Rule 403, shall be admitted unless excluded by the court pursuant to paragraph (b) of this rule." Paragraph (b) of N.J.R.E. 609, which is not applicable here, concerns convictions where "on the date the trial begins, more than ten years have passed

since the witness's conviction for a crime or release from confinement for it, whichever is later . . . ."

The Kline Defendants argue the trial court applied the wrong legal standard when it found the potential prejudicial effect of Stengel's conviction outweighed its limited probative value. They argue the trial court found only that the conviction had the potential to introduce "prejudice," not "undue prejudice" and that the prejudice "outweighed" the probative value of the conviction, not "substantially outweighed" the probative value.

Our review of the record reveals no basis on which to conclude the trial court abused its discretion when it excluded evidence of Stengel's conviction or that its decision resulted in a miscarriage of justice to the Kline Defendants. It was within the trial court's discretion to find Stengel's conviction for possession of CDS with intent to distribute was of limited probative value to the question before the jury – whether Stengel was negligent in the operating of his truck and caused the motor vehicle accident that injured plaintiff. In addition, the record supports the court's conclusion the potential for prejudice were the jurors aware of Stengel's narcotics conviction outweighed the limited probative value of the conviction. While the court's oral decision did not exactly track the language of

N.J.R.E. 403, we are satisfied the court's reasoning was sound and comported with N.J.R.E. 609 and N.J.R.E. 403.

In addition, we are not persuaded by the Kline Defendants' argument they suffered a miscarriage of justice because they were denied the opportunity to prove Stengel testified falsely at this deposition. First, while a jury might reasonably doubt Stengel's claim he did not remember when he was last convicted of a crime, there is sufficient support in the record for the trial court's finding Stengel did not provide false testimony at this deposition. Stengel admitted he had a criminal record and the Kline Defendants produced no proof he remembered the details of his convictions when he claimed not to.

Second, proof that Stengel provided false deposition testimony would have required disclosure of Stengel's 2018 conviction, and likely additional prior convictions. Given the trial court's decision excluding the 2018 conviction under N.J.R.E. 403, the record supports its conclusion the potential for prejudice of such evidence outweighed the probative value of Stengel's having provided false deposition testimony.

Even if the trial court erred, however, the exclusion of Stengel's conviction was harmless. It is clear the jury rejected Stengel's testimony he entered the intersection only after the traffic light turned green. The jury

therefore did not find him credible. The Kline Defendants argue the jury would have allocated more, if not all, of the fault to Stengel if it knew of his false deposition testimony. We find no support in the record for this speculative argument.

(c)    Exclusion of Morenski's Diagram.

Nor are we convinced the trial court's decision excluding Morenski's diagram resulted in a miscarriage of justice warranting a new trial. "Courts in New Jersey have permitted police officers to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary." State v. Labrutto, 114 N.J. 187, 198 (1989). Generally, a non-expert may give his or her opinion on matters of common knowledge and observation. See State v. Bealor, 187 N.J. 574, 586 (2006). Under N.J.R.E. 701, "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." "[P]erception . . . rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." State v. McLean, 205 N.J. 438, 457 (2011).

While the diagram's primary objective appeared to be the depiction of the vehicles' points of impact, which were based on Morenski's personal observations of the accident scene, the diagram included additional information based only on his assumptions. The diagram depicts Stengel's truck twice with an arrow between the two images. A reasonable jury could have interpreted the arrow as the officer's opinion Stengel did not stop at a red light before entering the intersection. Morenski, however, did not observe Stengel's vehicle enter the intersection, and whether he was stopped at a red light and entered the intersection only after the light changed to green was a disputed fact at trial.

In addition, the diagram depicts both Kline's van and plaintiff's car in positions approaching the intersection, as well as their positions after the crash with arrows in between showing the direction of travel. A reasonable juror could interpret those depictions as a representation of Morenski's opinion of where the vehicles were when the light turned yellow. Morenski, however, did not observe those vehicles approach the intersection, took no measurements at the scene, and conducted no investigation with respect to their operation prior to the crash. The location and speed of the vehicles before the crash, especially Kline's vehicle, were critical disputed issues at trial.

A-1017-23

Because the diagram contained Morenski's unsupported assumptions on critical factual issues, the trial court acted within its discretion when it excluded this evidence. We recognize Morenski's depiction of the vehicles' points of contact were based on his observations at the crash scene and were likely admissible. That evidence, however, was not separated from the inadmissible depictions on the diagram, all of which had the potential to confuse the jury, particularly in light of the weight they were likely to give to a police officer's opinion of the events leading to the accident.

B.    Motion for JNOV.

We apply the same standard as the trial court to determine whether a moving party is entitled to a JNOV. Riley v. Keenan, 406 N.J. Super. 281, 298 (App. Div. 2009). We have described the court's review function as "quite a mechanical one" of determining

> [w]hether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in . . . favor" of the party opposing the motion; i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ . . . .
>
> [Judge v. Blackfin Yacht Corp., 357 N.J. Super. 418, 424 (App. Div. 2003) (quoting Dolson v. Anastasia, 55 N.J. 2, 5 (1969)).]

29

A JNOV will be denied where the verdict is based primarily on credibility determinations. Alves v. Rosenberg, 400 N.J. Super. 553, 566 (App. Div. 2008) (citation omitted). However,

> [s]uch credibility determinations . . . may be removed from the jury's purview and a directed verdict granted when the testimony provided is uncontradicted and reliable, i.e., the testimony "is not improbable, extraordinary or surprising in its nature, or [where] there is no other ground for hesitating to accept it as the truth . . . ."
>
> [Ibid. (quoting Ferdinand v. Agric. Ins. Co. of Watertown, N.Y., 22 N.J. 482, 494, 498 (1956)).]

In Ferdinand, the Court explained,

> when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances and so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury.
>
> [22 N.J. at 494 (citations omitted).]

A "jury's factual determination will be disturbed only if we find that the jury could not have reasonably used the evidence to reach its verdict." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415 (1997).

As discussed above, the record contains ample evidence on which a jury could find Kline's and Stengel's negligence were the proximate causes of the collision. There is also sufficient evidence supporting the jury's allocation of fault among the defendants and the damages it awarded to plaintiff.

C.    Remittitur.

"A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). "[T]he trial court may not disturb a damages award entered by a jury unless it is so grossly excessive or so grossly inadequate 'that it shocks the judicial conscience.'" Orientale v. Jennings, 239 N.J. 569, 595 (2019). "Judicial review of the correctness of a jury's damages award requires the trial record be viewed in the light most favorable to plaintiffs." Cuevas, 226 N.J. at 488.

The evidence supports the jury's $3.5 million award to plaintiff. We have detailed above plaintiff's prolonged entrapment in her vehicle and extrication, limb- and life-threatening injuries, numerous surgeries, pain, scarring, implanted medical hardware, long recovery, limp, poor prognosis, likely future surgeries, need for pain killing medication, and physical limitations. We need not repeat those details. It suffices to say Kline's negligence in speeding through

31

a yellow light without assessing whether he could safely stop, without attempting to slow down, and without adequately monitoring whether a vehicle was entering the intersection from Jackson Road caused a motor vehicle collision that inalterably changed a twenty-two-year-old woman's life. The jury award, which amounts to less than $62,000 per year for plaintiff's life expectancy, is supported by the record and does not shock the judicial conscience.

To the extent we have not specifically addressed any of the Kline Defendants' remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1017-23